Good morning, Your Honors. I may have pleased the Court. My name is Andrew Greenlee, and I'm here on behalf of Carmen Johnson. Your Honors, I'd be happy to answer questions on any of the four issues that we raised in our brief, but I would prefer, if it pleases the Court, to focus on the first issue presented, because we believe that from a jurisprudential standpoint that that is the most important issue. And we also think that there is, based on the course proceedings below, there's a lack of clarity regarding when or whether a defendant who is under indictment has the right to a farmer hearing. Our position is that this Court should adopt a bright-line rule and hold that if a defendant is under indictment, the Sixth Amendment applies, and the defendant has the right to a farmer hearing. The District Court, on the other hand, ruled that the standard was, under the cases that apply Rule 41G, we think that the standard is, that's the wrong standard, and we think it's the wrong standard for at least four reasons. Any indictment will do. A defendant indicted in Seattle, in the Western District of Washington, for X, who owns property in Cleveland. Is that the rule you are after, no matter where, no matter when? That is right, Your Honor. And the reason why is because that defendant, if he's under indictment, he has a Sixth Amendment right to counsel of his choice. And if the government is impoverishing that criminal defendant, then he has the right to challenge the seizure and the forfeiture of that rule. And, Your Honor, none of the cases that are cited by the government deal with the case that we're in right now, and that is that somebody who is under indictment. So if you look at the Soza case, that was a post-conviction case. There was no indictment pending. If you look at Ramsden, the defendant, he wasn't a defendant. He was a defendant in Britain, but there was no indictment pending in the United States. If you look at Kitties East and Ritchie v. Smith, both those cases were pre-indictment seizure of funds. And in, at least in the Kitties East case, there was a grand jury that had been convened, but there was no indictment pending. So those defendants did not have the same Sixth Amendment right as the defendant here in this case. And so there really is no authority for the proposition, at least no authority cited, that a defendant who is under indictment does not have a Sixth Amendment right to challenge the seizure of those funds, to use those funds for his right under the Sixth Amendment to counsel of his or her choice. The second reason that we think that this Court should draw a bright-line rule is that it's both easy to administer and it has the benefit of clarity. There is no need to get into, under our position, there's no need to get into the ambiguity of what degree of nexus there is and what connection there is between the charged offenses and the uncharged offenses. And that inquiry is bound to be ambiguous, fact-intensive, and difficult for district courts to administer. Third, we think that the Farmer rule is the better rule because it takes into account a defendant's Sixth Amendment rights. If you look at the test applied by the district court, they first looked at whether there was a callous disregard for the constitutional rights of the defendant, whether the movement had an interest in or a right to the property and a need for the property, whether an individual would be irreparably injured, and whether there's an adequate remedy at law. None of those factors specifically take into effect or into account the defendant's, the exigent circumstances that a criminal defendant is dealing with, and that is that he is under indictment and he has to defend himself or herself in this case. And fourth, by adopting the rule that Farmer governs, if a defendant is under indictment, it would remove any possibility of or incentive to manipulate the charges in an indictment and thereby impoverish the defendant and circumvent the strictures of the Sixth Amendment. And, Your Honors, that is what happened in this case. If you look at the affidavit, the factual predicate underlying the seizure of the funds is virtually the same as the government's case at trial. And yet the government persuaded the district court that Ms. Johnson had no right under the Sixth Amendment because this was, in the words of the government, a separate investigation. And the government actually, it's worth noting, the government never actually indicted Ms. Johnson on the charges of the so-called forthcoming indictment. It simply cannot be the law that a defendant's rights under the Sixth Amendment are dependent on or turn on the way the government frames an indictment, its charging decisions as to when or whether separate charges are brought in piecemeal fashion. So, again, we would ask the court to adopt this bright-line rule, and if the court does, it can resolve the case on those narrow grounds. The court applied the wrong standard. This, in turn, led to a deprivation of counsel of Ms. Johnson's choice, which is, under Gonzalez-Lopez, a structural error. The court doesn't need to go any further. It can resolve the case on those grounds. But even if the court goes further and applies the farmer rule, Ms. Johnson still would win. She averred that she was heavily in debt. She owed BB&T $140,000. She owed the IRS $10,000. She had, because the government waited two years after seizing these funds to indict her on any charge, she had to deplete and exhaust. I'm sorry to interrupt. Did you just argue that, even if we were somehow to agree with you that a hearing should have been held in this case, that that would be the end of it? That this would be an automatic reversal? Is that what you're arguing? Yes, Your Honor. That's our position. How can that be? Wouldn't, at most, you be entitled to a delayed hearing? A taint hearing? No, Your Honor. No? Because under Gonzalez-Lopez, it's structural error. She argued. Wait, wait. The question is, is whether the outcome of a hearing would have yielded any relief to her. Isn't that an antecedent question? But by not holding the hearing in the first place. But the hearing can be held next week. If the hearing were held, but she's already gone to trial. She's already been to trial. Right, right. And so the hearing next week would be for the purpose of determining, wouldn't it, whether the seized funds actually should be available to her. Your Honor, this court is in the same position as the district court in that regard. You should, can, and should decide whether or not, if Your Honor is inclined to take that position, you can and should decide whether or not she was entitled to the hearing. Oh, we can't. No, not entitled to the hearing. Entitled to relief as a result of the hearing is what I'm getting at. Just because you have a farmer hearing doesn't mean you get the money back. Right? You're right, Your Honor. Okay. So how could it be a per se reversal here? Well, our position again, Your Honor, is that it impaired her right. It took away her right, deprived her of the right, the counsel of her choice. She went to trial with the counsel not of her choosing. And under Gonzalez-Lopez, it's structural error. But only if she had been entitled to have access to the seized funds in the first place. Am I not right about that? Your Honor. In other words, the district court could have held a hearing and said, these are tainted funds, they have nothing to do with this case, this is a separate case, separate investigation, you're not getting that money. That would have been a permissible outcome on the evidence, depending on the evidence. I don't think it would have been a permissible outcome, and here's why. So you're saying every farmer hearing means the defendant gets the money back no matter what? No, no. Okay. Then I'm really confused. Okay. I'm sorry. Let me clarify on the facts of this case. All the funds that were seized were funds that originated from her own customers. It's undisputed. All the funds were originated, it was not the product of fraud. But we don't know that. That's the whole point. Isn't that why you would have the farmer hearing? Well, Your Honor, we do agree that a farmer hearing should have been held. But having said that, even under any view of the evidence, the funds came from her customers. It's undisputed, even in the government's own affidavit. It said that the funds came from her customers, they were not the product of fraud, because her customers paid for exactly what they received, the same services that they paid for. So they were not defrauded out of funds. So if this Court were so inclined, it could rule that Ms. Johnson was deprived of a farmer hearing, and therefore she was deprived of the Sixth Amendment right to counsel over choosing, which, again, it's structural error under Gonzales-Lopez. But getting back to the main argument. In other words, your position is the only potential victims of the unindicted fraud were her customers. Well, our position, our antecedent position, is that it's the same case. I understand that's your position, but if you're wrong about that or if one disagrees with you about that, it's a separate case, it's a separate scheme, and you're saying the only potential victims were the customers and the customers got what they paid for. Well, the government said that the victims in their briefing, their kind of last-minute briefing before the District Court, the government took the position that the victims were the banks and the downstream banks. That's exactly my point. Right. So why are you talking about the customers? Because that's where the money came from. The banks did not pay. The funds that were seized were not bank funds, so they couldn't have been traceable to criminal activity, and that's why the government said that they were substitute assets. I mean, I think the government had it right the first time when they issued the affidavit in the District Court, and that is that these are substitute assets that were seized and frozen. They were not the proceeds of fraud because she was not defrauding her own customers. They got exactly what they paid for. She was selling good credit, and that's what they got. Now, the banks might have been the downstream banks. They might have been defrauded, and that's the government's theory of the case. But the money that was seized did not come from the banks. It was not traceable to criminal activity. But the money from the customers were the proceeds of the fraud. No, no. What were the proceeds of the fraud? If you assume it was fraudulent, that the whole, as you put it, selling good credit to customers, assuming that was fraudulent, that was a fraudulent scheme, wasn't the payment by the customers the proceeds of the fraud? I mean, she didn't rob a bank. No, the proceeds of the fraud was the money that was lent from the banks. It was not the money that they paid her to improve their credit. So assuming it was fraudulent, she didn't get any proceeds from the fraud? She got her money from the customers in advance, and that's our point. So it was the customers defrauding the banks? It was the customers who were defrauding the banks, and she was not a party to those transactions. She never put her name on any of the documents that were the loan documents. She was not a party to any of that. She was not a member of the Tanzanian community. She had no nexus. Even the government, I think, would admit she had no nexus to the fraud committed except that she ran a credit repair business, which, by the way, Your Honors, that's regulated under the Credit Repair Organizations Act. It's not per se illegal in the first place. So I think that it's easy. You know, the government puts it in quotes in their briefing, credit repair, but it's easy to lose sight of the fact that there are legitimate forms of credit repair. It's regulated under a statutory framework enacted by Congress, and if the government had wanted to seize those assets, then the proper way to do it would be if the FTC comes in and seizes them in a criminal or, excuse me, in a civil FTC action, it shouldn't be that you shouldn't have to resort to the wire fraud framework to seize those assets. And if Your Honors have no further questions, I'd reserve the remainder of my time. Thank you, Mr. Greenlee. Ms. O'Malley. O'Malley. May it please the Court. My name is Christy O'Malley, and I represent the United States, and I ask the Court to affirm the conviction and sentence in this case. I want to start with a basic principle that applies no matter what standard this Court adopts, whether you adopt the Rule 41 standard or the farmer standard, and that is that these funds in these bank accounts were criminal proceeds. Just like drug customers pay their drug dealer for the drugs, these customers were paying Carmen Johnson for fraud. They were paying for fictitious trade lines that were then communicated to Experian. What she did is report to Experian that there were loans these customers had from CJ Lending or Able Estate, and that they had paid installments, monthly payments on those loans for a year, two years, three years, when in fact she never issued any loans. The whole purpose of this entire scheme for over 2,000 trade lines that were reported to Experian was to be able to get by credit, buy good credit for these customers, to make up credit histories, to make up a payment history, to make up a credit score so that those customers could get loans. That was the purpose of this fraud. Your initial affidavit indicated that these were forfeitable as substitute assets. Do you still maintain that position, and why did you supplemental affidavit? No, Your Honor. I think as we conceded below, I think the affidavit was inartfully drafted. I would say a more apt term to use would be substitute criminal proceeds. In fact, there's criminal proceeds that are loan proceeds that come from the ultimate end game, which is to use the good credit to get loans, and there's criminal proceeds that come from customers. Just like I said, drug customers pay for their drugs. Here, fraud customers paid for the fraud that they got in the form of good credit. So I think while the affidavit does talk about substitute assets in terms of the law, the legal premise in the affidavit, all of the facts in the affidavit talk about criminal proceeds. The facts in the affidavit make it clear. I want to be clear, at least the prior case law that we had, that some say put us as being the only circuit that said that you could do it. You're pretty comfortable with us saying that this Louise case is, for the most part, done away with that? Yes, Your Honor. I believe the Louise case makes clear that if it's substitute assets, and we're solely talking about substitute assets and it's an indicted case, the defendant does have the right to use those substitute assets upon the proper showings to pay for counsel. The Louise case also makes clear, which is our position, that the defendant does not have the right to use criminal proceeds to pay for her counsel. And all the facts in the affidavit make clear here that what we are talking about is criminal proceeds that the defendant is trying to obtain. These are assets that were in the corporate bank accounts of C.J. Lending and Able Estate. The primary focus of that credit repair business, and the reason we put it in quotes, is credit creation, fictitious credit creation. That's where they made their money. That's the money that was in those accounts. That's what the affidavit says. The affidavit talks about the fact that Experian reported that this was fraud, that there were 2,000 trade lines reported, that some of these trade lines actually were supposedly created before the businesses even existed. These people were getting loans from a company that wasn't even in existence. And Experian figured this out and reported it to the government, and that is what the affidavit talks about. The affidavit says that in examining the bank accounts, there is no evidence that any loans went out of the bank accounts to these customers. All the money is coming in, and the only thing going out is wire communications to Experian with fictitious loan information and fictitious credit. This is wire fraud. As Judge Chasnow correctly noted in her opinion, We're going to try the case, aren't we? What's that? We're not trying the case. No, we're not trying the case. Well, it seems to me most of your argument is trying the case. We're talking whether or not you have a right to withhold funds that prevents a person under Sixth Amendment to have a right to the counsel of their choosing. And up until the 11th hour, the government said these were substitute funds. Just before the 11th hour, you and an affidavit represented to a court said these were substitute funds. Then at the last minute you said, oh, oh, mea culpa, it's not. It's some other related investigation that it's tainted from. It seems like that circumvented the opportunity to have the hearing clearly, doesn't it? I have two responses to that, Your Honor. First, the affidavit in its facts, the factual basis of the affidavit, talks only and solely about criminal proceeds. It does not talk about Carmen Johnson's retirement accounts, her personal bank accounts. It talks about the corporate accounts where the fraud money went. So the affidavit does establish that the money that is being seized is criminal proceeds. Yes, the affidavit uses the term substitute assets. If I had to go back and write it, I would. That's a good term. That's very important. That's the linchpin to determining the rights, the due process rights, to have the funds available to hire your lawyer. You see, in terms of the framers, this is probably the most dangerous type of cases because you can undermine the Sixth Amendment right by depriving someone who's under indictment of the funds to hire a lawyer of their choosing, which they have a constitutional right to do so. So it's not just a term. It's very important. Potentially, this makes the king the king. That's why the framers do it. So it's kind of disturbing. At the last minute, you would change this. The theory of your case didn't change, did it? There's two separate investigations going on, so it depends on the theory of which case you're on. Have they been indicted on that investigation? They have not been indicted on that investigation. And there was nothing to test at all the taintedness of that alleged investigation because there was no hearing, correct? Well, let me go back. There actually was a lot of process, and there was a hearing, and there was briefing, and there was supplemental briefing before Judge Chaznau issued her opinion. So while there was not an evidentiary hearing where an affiant was put on the stand to say the same things in the affidavit, where the outcome, frankly, would have been the assets were tainted. You're saying there was a farmer hearing? No, I'm not saying there was a farmer hearing. I'm saying there was due process in this case. That's the due process required is a farmer hearing. Are you going to change the definition? You can't change that. That's what would be allowed and a right to. There's no substitute for that, is there? The right to a farmer hearing depends on a showing of two things. One, that you have a need for the assets. And two, that there's a bona fide reason to believe that the probable cause determination was wrong. And they cannot meet the second prong of that test at all. There was nothing put forward at all to say that there was any reason to believe the probable cause determination by a judge was incorrect in this case. In Farmer specifically, the defense counsel put forward an affidavit from defense counsel saying that they spoke with government agents, and the government agents said that some of the funds or some of the assets that were seized, it was counterfeit goods or not counterfeit goods, some of the assets that were seized were, in fact, not counterfeit. And, therefore, they were legitimate assets, substitute assets that the person should have had a right to. In this case, there was no showing whatsoever that any of the assets that were seized, there's no showing by the defendant, no prima facie showing, no showing at all that any of the assets were, in fact, not tainted. And that is a prerequisite to getting a Farmer hearing. Farmer itself. How much time elapsed between the seizure and the hearing? Do you recall? It was two. In other words, how long were the funds in the government's possession? The funds were seized in March 2011. The first request for the funds back was in December of 2013. Okay, more than two years later. Correct. Okay. So there was more than two years. And when, the indictment was when? June of 2013. June of 2013. So it was two years after the seizure, before the indictment, and then another three or four months or so before there was a request for the funds. Correct. The indictment was in June of 2013. The first request for funds was in, and by the way, I want to not forget the point that in June of 2013, within, I think it was nine days of the indictment, retained counsel entered their appearance in the case. Six months later, that retained counsel, plus an asset forfeiture expert, entered their appearance in the case and started litigating the seizure of the funds. Which was then more than two years old. Which was then more than two years old. Correct. So the, but going back to the farmer decision, I want to point out that Farmer itself on page 805 says a due process does not automatically require a hearing, and the defendant may not simply ask for one. It is not enough to just say, I need money to pay for my counsel, and therefore I get a hearing. There are two prongs to the test. There is not just one prong. Even if you credit that her affidavit, her self-serving declaration, is enough to meet the first prong of the need for the assets, which, by the way, states that she's behind in her mortgage, states that she owes the IRS, states that she has no money, but offers no evidence whatsoever to support that. There were no bank statements. I would treat this like a pre-indictment type request, as opposed to one in which she had already been charged an indictment. Yes, as the government's primary, as I indicated in the briefs, our primary argument is that the proper standard to analyze this under is a pre-indictment standard, because this was a separate investigation run by a separate AUSA, a separate lead agency, and it involved the investigation of the entire credit repair business that Carmen Johnson engaged in with her. Carmen Johnson was under indictment. I'm sorry? Was it Johnson under indictment when she sought access to these funds? She was under indictment in a separate case, yes. It's the same type of case. This broader theory of investigation, it was the same type case, correct? Her particular conduct involved credit boosting, making up trade lines in the indicted case, yes. And in the investigation, the matter being investigated as well, correct? Yes. So this is not a different type of genre of alleged crime. It's the same thing, and this is post-indictment, and she needs counsel. And in this case, didn't she lose counsel of her choice because she didn't have the funds? No, Your Honor. She didn't. As a matter of fact, the record shows that she fired counsel and decided to go pro se and sovereign citizen of her own accord. The letters in the supplemental joint appendix that I submitted that she sent to her counsel on July 21st, I believe it was 2014, indicate I fire you, I release you of everything. Then counsel filed a motion to withdraw its counsel. Nowhere in there does it say Ms. Johnson cannot pay us the funds necessary for us to continue representing her. Instead, it says there is a breakdown in the relationship, she refuses to call us back, she won't communicate with us, and we cannot provide effective assistance of counsel under this scenario. There is nothing about the need for funds. I also think it's important to realize that within a week of her conviction at trial by a jury, retained counsel entered their appearance to litigate the motion for a new trial and her sentencing, and she has retained counsel on appeal. So there's a fundamental question if we're looking at the case as a whole going back in time of whether she actually needed the seized assets from then defunct companies that were entirely a fraud. That's why you have the hearing. If you can make the prima facie showing. Well, she said she needed the money, correct? So if you credit that, she's met prong one. She made no showing whatsoever on the second prong to indicate that, in fact, she had an entitlement to those or that there was a probable cause determination that was in error. There has to be some showing. In Farmer, there was a showing. What did she say she had to show on the second prong? She has to show that there was a, and I don't want to get it wrong, so I'm going to, that there was a bona fide reason to believe that the court erred in the probable cause determination in seizing those funds. And you admit that's the analysis under pre-indictment, though? That's the analysis of Farmer. All right, go ahead. So even if this Court says, you know what, this was exactly. Go ahead and continue what you're saying. Go ahead. What did she have to show? Sorry. So even if this Court were to say, you know what, this was the same case, the same conduct that she was indicted for is what you were investigating. I don't know if the Fifth Amendment implicates the private interest in the Sixth Amendment right system there, even when you have a different investigation. So I don't know if you escape it by saying that we do it. It's the Fifth Amendment that does it. Certainly you have due process rights. I'm not disputing. And it's the same interest that's there, whether it's an investigation. So if we take this as an indictment that she now has and she's seeking to access a Sixth Amendment right, why does not Farmer then say you ought to give a hearing? Because she hasn't put forward, even a prima facie showing, any showing whatsoever to say that there's a bona fide reason to believe that the magistrate judge got it wrong in the probable cause determination to believe that. I'm saying she hasn't made the showing that would entitle her to a hearing. If she hasn't made the showing that entitled her to a hearing, she's not under Farmer. You don't simply get to say I want a hearing and you get one. Under Farmer. I think you were about to say, I thought you were about to echo what I said earlier, namely, even if we buy the defense arguments lock, stock, and barrel, what happens in this case is it goes back to the district court for a hearing. Correct? Correct. And I think there's a fundamental disagreement on the proper remedy here because under Gonzalez-Perez, what happened in that case, the denial of the right to counsel of one's choice, was the defendant wanted a particular person representing her, and the court in that case said this person has some amorphous disciplinary issues and we're not going to let this guy represent you to the point not only are we not going to let him represent you by sitting with you at counsel table, but we're going to make him sit in the gallery and not be able to communicate with defense counsel that we're going to impose upon you. So the person was forced to go to trial with the counsel of their choice sort of handicapped from even being able to communicate with them about their case. That's a totally different thing than saying should she have been able to use these funds to pay for the counsel of her choice that she then fired immediately thereafter and didn't actually choose. But the issue here is that the – I think if you were – first off, we're in a little bit of a strange posture and I think this is what you were getting at because why wasn't this appealed directly after the district court's ruling? Then there could have been some remedy where there could have been a hearing. You could have remanded it and said we should have this hearing if you agree that she met both prongs, which she didn't. But you're going to get there if you don't – if you take the first position that this is pre-indictment type standard here. That's basically where you are. That's okay. I've sort of postulated maybe the Fifth Amendment has put this in a position that the Sixth Amendment, private interest must be taken into consideration with the investigation. She was under indictment. Therefore, she's invoked her Sixth Amendment right. If that's so, then FAMA binds you then to make some determination as to the prima facie case being made here, which is where the hearing comes in. You assume that's been done by saying she didn't make one. But I don't think the district court made that determination. Well, the district court made the determination that the affidavit – But he didn't do it because he thought it was a pre-indictment hearing. He said, well, I don't know if it applies or not. Because, you know, because it's pre-indictment. So two responses to that. I'm just giving the answer that if it's post-indictment, she's indicted. That's not the correct standard. Two responses to that. One, Judge Chasnow did reach the merits of the defendant's argument at the end of her opinion and said everything in this affidavit talks about criminal proceeds, and this is, in fact, wire fraud, that all you have to have is a scheme to defraud and wires and further. And this affidavit demonstrates that that's what happened. There was money from customers, which are criminal proceeds, and there was a wire to experience and furtherance. So Judge Chasnow actually did reach the merits of even under a farmer determination that this affidavit on its face – Well, even if it is an error in the way that he proceeded on it, did it constitute a reversible error? And that seems to be what you're now arguing is that, well, even so, he went on and did all these things. Well, first, I don't concede that it's an error in the first place because I think there is an argument to be made that this was – That he considered it as a pre-indictment type standard. I think Judge Chasnow, correctly, in the posture of December of 2013 into early 2014 when this case was being evaluated, when this litigation was happening, interpreted it as a pre-indictment request for funds to which the defendant had no right because there was a separate, bigger investigation going on into her entire business. And that's where we can park the company there because, as I said, I think the Fifth Amendment informs you on how to treat those separate investigations when analyzing Sixth Amendment rights for counsel. All right, so the question – There is no constitutionally reversible error. I know you don't want to concede it, but why? It's a factual determination. It's not a presidential situation. So, I mean, if you think that it's sufficient, why is that not enough? I do believe it's sufficient, and that's why I start with the premise, the fundamental premise that regardless of which standard this court chooses to apply, whether looking in hindsight, you know, in reverse – I don't want to be argumentative, but at this business of chooses to apply, it's pretty much clear what you apply. If it's pre- or post-indictment. That's the only question is, which one do we see this to be? Correct. And whether it's pre-indictment or whether it's post-indictment, a defendant never has the right to criminal proceeds to pay for counsel. That's the fundamental underpinning of either argument, and the affidavit in this case establishes by the facts in the affidavit that what was seized from Ms. Johnson was criminal proceeds, and she doesn't have the right to have those criminal proceeds to pay for counsel. That's the equivalent of saying you can go rob a bank and steal a million dollars and then claim I really want to have good counsel to defend me in this bank robbery, so I'm going to ask for the million dollars back. You can't do that. The Supreme Court is clear in its Lewis decision. Every court that has considered this issue is clear. Defense counsel conceded it below. They conceded it in their brief before this court. If it's criminal proceeds, we're done. Everything in this case establishes that it was criminal proceeds that were seized from Carmen Johnson, and that is what she was trying to use to pay for her counsel. She made no showing whatsoever that would entitle her to a hearing to be able to say that somehow now their substitute assets, when the facts show they're criminal proceeds, when her entire business was a fraud, and when every penny that came from those customers to buy these trade lines was proceeds of a fraud. And for all those reasons, Your Honors, I ask that you affirm the Supreme Court. Well, you said they were substitute yourself. Yes, Your Honor, there is. As we've conceded, if we had to go back and do it again, we wouldn't call them substitute assets. Well, you make a mistake, everything is fine. But the Constitution gives the rights to the defendant and the Sixth and Fifth Amendment rights. But it's a very serious type case, isn't it? I feel as though you could just sort of, oh, it's just wordsmithing, inartful. We make a mistake, we do it again. This is very key, isn't it? Because if you ultimately can withhold funds from a person being able to defend themselves, you could end the whole game. Everybody knows that there's a correlation between being able to hire your own lawyer and those who have court appointed lawyers. There is a statistical significance in terms of prevailing at trial, in terms of your chances to go much higher, right? Just like being able to make a pretrial release versus being incarcerated. These aren't just theories from a practical world. They make a difference. And sort of cavalierly to say, oh, at the last minute, you just switched seemingly to your convenience, because at some point you could, because pre-indictment called them substitute, and that was fine. But then you have to switch and say, no, they're tainted. Correct? I think where I disagree, Your Honor, is that the facts in the affidavit didn't change. And the facts in the affidavit that describe the assets that were seized established that those were criminal proceeds. How do you cross-examine an affidavit? You don't cross-examine an affidavit. Right, you don't. But the defendant still has to make a showing. That's why hearings are important. Sure, and... the value of a hearing completely almost. That's the whole point of it. If the defendant... A hearing. Because that's, you know, our frame was set forth property, interest under the Fifth Amendment and Sixth Amendment. And it's triggered when you post indictment. It seems like that standard was used by the court, the district court, as pre-indictment the whole time. Don't we have to get that right? First? First, the district court did have briefing, a hearing and supplemental briefing before reaching the conclusion that these were criminal proceeds and therefore the defendant wouldn't be entitled to them. And the defendant never made the prima facie showing to get a hearing. And that's required under this court's precedent in Farmer. That's required. And the defendant didn't make that showing at all. For those reasons, I again ask the court to affirm the conviction and sentence in this case. Thank you, counsel. Thank you. Mr. Greenlee. Thank you, Your Honors. The government says that Ms. Johnson did not meet the second prong of the Farmer analysis, but that's because they, up to the 11th hour, said that it was substitute assets. So how could she meet that second prong when she was automatically entitled to it under their very own theory, which, by the way, it's not a drafting error. It was mentioned 11 times. It was about a page of briefing replete with case law and authority on the court's authority to seize assets that were substitute assets. So the court, of course, has authority to seize assets that are substitute assets. But then when the rubber met the road and she asked for the assets back, then they changed their theory. So it's a little bit difficult for Ms. Johnson to meet a theory under Farmer, the second prong under Farmer, when the government is saying these are substitute assets because they were proceeding under the, I think the attorney below said it was a one-foot putt because it was, under their own theory, substitute assets. The reason they did it is because we allowed for substitute assets at that time. And then, of course, Louie kicks in this year and kind of informs us that's not correct. And I think that's why the Supreme Court gives guidance to the lower courts, and I think this court should heed that guidance and find that she was deprived of counsel of her choice. And before I move on, I want to address one point. If I may, two quick questions. Yes, Your Honor. I realize you weren't counsel at the time, but why wasn't there an interlocutory appeal if this was so important? Because this is one of those rare instances, as you well know, in which, in a criminal case, federal courts will permit an interlocutory appeal, number one. And number two, can you just tell us what would have happened differently if what you now want, leaving aside the, per se, reversal, what would have happened differently? What would have happened differently? Okay. Addressing your first point, Your Honor, I was not counsel below, so I can't speak for counsel, but it might have had something to do with she had no money. Okay? So it takes money to appeal to the Fourth Circuit Court of Appeals from an interlocutory collateral order. So that might have had something to do with it. The second piece of it also, and I don't want to get into what her attorney-client relationship was, but that also might have had something to do with the fact that sentencing, we know that from her family members, that her attorneys were urging her to take a plea, and she fervently believed that she did not commit the charged offenses. And so that, I'm not saying that the lack of money led her attorneys to take a different position and urge her to take a plea, but I'm also not saying that it wouldn't be the first time that lack of funds steered a defense attorney to try to resolve the case short of trial. It's worth noting also that the attorneys at the, well, what wasn't a farmer hearing, the aborted farmer hearing, they said to the court, she's out of money. She hasn't paid us. Well, what would have happened if the judge had held a farmer hearing? That's really what I'm asking. Right. If the judge had held a farmer hearing, if he had gotten it right, what he would have done is found that this was not the proceeds of fraud because nobody was parting with property. Nobody was defrauded. Now, the government, they leave out an element of fraud, and that is you have to part with property. Somebody has to be defrauded of property, and that's Cleveland, that's SACAR, that's established precedent, Your Honor. And here, her customers didn't part with property. The mail fraud statute does not require an actual loss to anybody. I don't understand what you just said. Your Honor, if the court, I would commend to the court's attention the Cleveland decision from the United States Supreme Court, wire fraud requires someone to part with property. That's an element of wire fraud. Somebody has to be defrauded, and it can't just be there's no federal ban on lying to Experian. That's not wire fraud. To lie to Experian is not wire fraud because Experian doesn't part with property. In fact, Ms. Johnson paid Experian a fee. So Experian is not being defrauded. It may be a distortion in how they rate people's credit. It may create background noise. It may create an annoyance for Experian. You don't think they're being defrauded when their data are corrupted by the insertion of false, non-existent lines to bulk up the credit history of the people they report on? You don't think that harms their business model? It harms their business model, but they're not, she is not depriving them of property. They are not paying her money as a result of her. You don't think they lose business as a result of that? No. Your argument is that she has to deprive them. She has to gain money from Experian for them to part with property. Honestly, if the court looks at that SACAR decision, that's a 2013 United States Supreme Court decision, the right to a disinterested legal opinion is not depriving someone of property for purposes of wire fraud. You've looked at our recent Johnson opinion, which is unpublished, in which Experian was identified as the victim in exactly this kind of scheme. Have you looked at that case? Your Honor, I have not. It's very recent, within the last couple of months. I apologize, Your Honor, I'm not familiar with that. From North Carolina. Okay, if Your Honors are, look, even if Your Honors are disinclined to believe us, that none of it is the proceeds of fraud, it doesn't mean that she's not entitled to a hearing because some of the proceeds could have been fraudulent and other proceeds might not. Let's say there's only $50,000 that were found to be legitimate and untainted. She would still have a Sixth Amendment right to that small segment of funds to pay for her attorney. So it doesn't defeat our claims by any stretch that she hasn't proven that any specific segment of the money was clean and untainted. She didn't have a hearing to do that in the first place. So the record is undeveloped on that point. And we think that we should win under any analysis. Well, it is a different type of case when the government starts out with one particular theory and substitutes assets. Case comes down for the Supreme Court and magically they change it over to a more tenable theory. I'm not saying that it's not supported, but I'm just saying that one that may have already been there, they just chose to go a different way on it. Your issue, your question now, at least your statement now, is that the hearing should have been held because perhaps it was mixed. That's exactly right. It could have been 95%. I don't know if we've ever confronted that issue before. Well, it's a tricky issue, admittedly, Your Honor, but that's why you have a hearing so you can develop the record so Your Honors can make an important point. Hearing is discretionary. It doesn't have to do it, but you think that the court might be compelled to do it. In an instance, there is some indication where it possibly could be mixed. In an instance where the government has, in one hand, issued an affidavit saying it is substitute assets, it issues another one and says it's fraud for fraud. That might indicate that if those affidavits, which we've got to believe both of them are true, that part of this is substitute and part is not. But how does that inform the outcome? Well, I think it informs the outcome in that we should be entitled to a hearing. And let's not forget also that the government, in their last-minute briefing before the court, they said that it was the banks who were the victims. Now, it's uncontested that those funds didn't come from the banks. So we think that the… Do you agree with me now that even if we agree with you, that at most what you get, at least initially, is a hearing? Your Honor, we would take what we can get. Okay, that's a good answer. But are you agreeing with me now that if we agree with you on the merits, that what happens in this case next on remand is a hearing? Your Honor, we believe that, and I'm going to be steadfast on this, we believe that under Gonzalez-Lopez, it's structural error and she deserves a new trial. And with that, if Your Honor has no further questions, I'll sit down. I have one quick one if Judge Gregg will indulge me. I assume that the actual civil forfeiture is still pending. That hasn't been resolved? No, Your Honor. Actually, they moved the district court to apply those funds that were unindicted to the loss in this case. Okay. So to a certain extent… So the case is still just standing out there? The forfeiture case? Yeah, the forfeiture case. No, Your Honor. They took those funds and they applied them in this very case. They took those funds from unindicted conduct and they moved the court to apply those… And was that done pursuant to due process procedures? She got notice and an opportunity to oppose that? They filed a motion in the court, Your Honor. And that was contested? That was… Your Honor, I didn't represent her at the trial court level, but… Okay. Do you know what the outcome was? The funds were applied. So she lost? She lost. So there's been a determination that those were criminally derived funds, right? It's not a determined… No, no. I don't think there's been a… How can it not be? If there was a motion… It's not something that this court cannot clean up on remand, Your Honor. What is there to clean up? There was a hearing. There's a Sixth Amendment violation and a Fifth Amendment violation. There's no Sixth Amendment violation if, in fact, after her conviction, if I understood your answer, there was a proceeding in the civil forfeiture matter, which she had counseled, contested, and a determination was made, apparently, that these were criminally derived funds. And therefore, the district court moved those funds for restitution or whatever into the actual indicted case. Is that what you just told us? Your Honor, that's my understanding from the course of proceeding, just reviewing the docket below. So it sounds like she got the very due process that you're here arguing she was actually entitled to before she was convicted. Before she was convicted? Absolutely not, Your Honor. That was a post-conviction. No, no, no. What's the difference? The outcome of the hearing is the same. The outcome is not the same because she went to trial without counsel of her choice. No, the outcome of the civil forfeiture is the same. But she was convicted without counsel of her choice. Okay. Counsel Longstreet, you don't know what happened in terms of the forfeiture. Is that correct? I don't know what happened, Your Honor, with regard to the— I'm sorry. It's available on CMUCF. I'm sure Your Honors can pull it if you'd like. But we don't think that that's any substitute, not by a long shot, for a farmer hearing prior to trial. And Your Honor should err on the side of caution here. This is a Sixth Amendment, a defendant's Sixth Amendment right, which in the Louise— they went on for pages and pages in Louise about how important the Sixth Amendment right to counsel of their choice is. In the criminal context, without it, the whole process breaks down. And with that, Your Honors, I'd appreciate it if you would reverse and remand for a new trial. Thank you. Thank you so much. We'll come down to Greek counsel first. We'll ask the clerk to adjourn us for today, then we'll come down and meet counsel. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Roger L. Gregory, James A. Wynn Jr., Andre M. Davis